425 So.2d 291 (1982)
Ira K. ELLENDER
v.
TEXACO, INC.
No. 82-341.
Court of Appeal of Louisiana, Third Circuit.
December 22, 1982.
Rehearings Denied February 4, 1983.
*292 Stockwell & Associates, Robert W. Clements, Lake Charles, for defendant-appellant-appellee.
Jones, Jones & Alexander, Glenn W. Alexander, Cameron, for plaintiff-appellee.
Before DOMENGEAUX, FORET and LABORDE, JJ.
LABORDE, Judge.
Ira K. Ellender brings this action under the Jones Act, 46 U.S.C.A. Sec. 688, and General Maritime Law against Texaco, Inc., his employer, for injuries sustained while he was working as a roustabout in Texaco's East Hackberry Field in Cameron Parish. Joined as a party defendant is American Motorist Insurance Company, the liability insurer of Texaco.
The case was tried before a jury which returned a verdict in favor of Ellender and against Texaco and American for the sum of $700,000.00. Texaco and American appeal this jury verdict. Ellender answers and appeals the lower court's decision to award legal interest only from the date of judgment rather than from the date of judicial demand. We affirm the verdict *293 rendered by the jury and the court's decision to award legal interest only from the date of judgment.
The following issues are raised in this appeal:
1) Whether the jury erred in concluding that Ellender sustained an injury as a result of an accident occurring on October 27, 1977?
2) Whether the jury erred in concluding that the M/V "Bret B" was unseaworthy and that such unseaworthiness was a legal cause of Ellender's accident?
3) Whether the jury erred in concluding that Texaco was negligent and that such negligence was a legal cause of Ellender's accident?
4) Whether the jury erred in concluding that Ellender was not negligent?
5) Whether the jury erred by rendering an excessively high award in favor of Ellender?
6) Whether the trial court erred by allowing legal interest only from the date of judgment rather than from the date of judicial demand?

FACTS
Ira K. Ellender was employed by Texaco as a head roustabout in Texaco's East Hackberry Field situated in Cameron Parish. The East Hackberry Field is comprised almost entirely of an area within Calcasieu Lake. The field contains a large number of producing oil and gas wells, compressor stations, a tank battery, connecting flow lines and pipelines.
Most of the work done in this field is performed on the water. Texaco uses a 45 foot-long workboat, the M/V "Bret B" to perform work on the water. In addition, a 50' × 100' roustabout barge is provided with the M/V "Bret B".
On October 27, 1977, Ellender was the head roustabout in a crew that had been assigned the job of replacing a 27/8" flowline from Well No. 69 to a separator station. The well was located in the middle of the lake and the flowline ran in a southwesterly direction from the well to the edge of the spoil bank where the Calcasieu Ship Cannel had been dredged out over the years. At the edge of the spoil bank the line made a turn to the north along the edge of the lake and went northerly towards the separator station which was situated off the spoil bank in the water.
The flowline to be replaced was approximately 5,000 feet in length, with the last 800-1000 feet lying along the spoil bank in an area that was hilly or sandy in some areas and marshy, muddy and boggy in others. The lines consisted of joints of steel tubing 27/8" in diameter, measuring 30-31 feet in length, threaded on each end with the successive joints of pipe being screwed into each other. The pipe weighed approximately 190-210 pounds per joint.
The line was laid over a period of 2 or 3 days with the use of the M/V "Bret B" and roustabout barge. The pipe was first loaded onto the barge by use of a winch truck located on the barge and then hauled to the well-site where the line originated. It was laid off the back end of the barge and lowered into the water one joint at a time. As the boat and barge were moved forward, another joint of pipe was screwed into the last one which was strung off the barge. Then the vessel would move forward again and another joint would be screwed in. This operation continued until the boat and barge had proceeded southwesterly toward the spoil bank as close as they could in the progressively shallower waterapproximately 1200 feet from the bank.
When the vessel could go no further because of the low water depth, another mechanical operation was commenced to continue stringing the pipe toward the spoil area. In this operation, the barge and vessel were first spudded securely into place so they would not move. The pipe was then pushed toward the bank by use of the winch truck. Two empty drums were strapped to the first joint of pipe for flotation. Then additional joints were screwed on and, as each joint was connected, the line was pushed on out into the water by use of the winch truck and line and a block and tackle system.
*294 Finally, after the string of pipe was as close to shore as it would go and this part of the operation was completed, there remained approximately 800-1000 feet of line to lay from the edge of the spoil bank, across the marsh, to the separator station, which was out in the water.
Texaco provided no mechanical equipment to complete this last portion of the assigned job. Instead, a contract labor crew of four laborers was hired to work with Ellender and one other Texaco roustabout. Ellender and his co-workers were required to lift the 190-210 pound pipe to their shoulders and then haul the pipe across the marsh. Halfway through this portion of the job, Ellender stumbled while carrying a joint of pipe. Ellender felt a stinging sensation down his leg and across the lower part of his back but he was able to continue his work. At the end of the working day, Ellender reported the accident to the Texaco foreman on duty. An accident report was completed that afternoon.
Over the next couple of days, Ellender began experiencing increasing pain in his back. He went to the emergency room of West Calcasieu-Cameron Hospital but was not admitted. Ellender consulted his family physician who referred him to an orthopedic surgeon. Over the next two years Ellender had three major surgeries performed on his back including a disc removal, a fusion and finally a decompressive laminectomy.
Ellender instituted this suit on November 15, 1979, under the Jones Act and General Maritime Law to recover damages for the injuries he suffered. After a four day jury trial beginning on February 17, 1982, a verdict was returned in favor of Ellender and against Texaco and its liability insurer, American Motorists Insurance Company.
Texaco and American appeal this adverse verdict assigning five errors in the jury's verdict. Ellender answers this appeal and appeals the ruling of the trial court which denied legal interest from the date of judicial demand.

SCOPE OF REVIEW
We recognize at the outset our limited role in reviewing this jury verdict. Although this court is constitutionally authorized to review both the law and the facts in civil cases, under Federal Law and jurisprudence, which we must apply in cases applying Federal Statutes and federal maritime law, the jury's finding of facts cannot be disturbed by an appellate court unless there is no reasonable evidentiary basis for the jury's conclusions. Rains v. Diamond M. Co., 396 So.2d 306 (La.App. 3rd Cir. 1981); Trahan v. Gulf Crews, Inc. 260 La. 29, 255 So.2d 63 (La.1971). Noting this scope of review we proceed to consider the assignments of error urged by defendants, Texaco and American.

ASSIGNMENT OF ERROR # 1
Texaco's first assignment of error is that the jury erred in its finding that Ellender sustained an injury as a result of an accident occurring on October 27, 1977. Texaco relies heavily on the testimony of Harold Fry, Ellender's co-worker. Fry testified that he did not see Ellender experience any difficulty during the entire period Ellender was carrying the pipe nor did Ellender tell him that he had hurt himself in any way. Texaco asserts that no one person corraborated Ellender's claim that he had hurt himself on the job on October 27, 1977.
Contrary to Fry's testimony was Ellender's testimony. Ellender described the procedure of hauling the heavy pipe over the somewhat treacherous terrain. He described how the marsh was full of bog holes, ruts and muddy spots and he further described how he stepped into a hole or rut which almost caused him to stumble. When Ellender adjusted or caught himself to keep from stumbling he felt the burning sensation in his leg and back.
Ellender's credibility was bolstered by the testimony of Jack Lambert, the Texaco foreman on duty. Lambert testified that he believed Ellender got hurt just like he said. Another Texaco employee, Francis Lyons, who was not in the crew hauling the *295 pipe but who was at the dock the afternoon Ellender and his crew came in, testified that he saw Ellender coming up the steps of the M/V "Bret B" holding his back like he had a catch in it. When Lyons asked Ellender what happened Ellender replied, "he'd slipped while carrying a joint of pipe". Finally Dr. Williams G. Akins, Ellender's treating physician, testified that the accident as related to him by Ellender, was consistent with the injuries found.
We conclude that this testimony forms a reasonable evidentiary basis for the jury's conclusion. For this reason Texaco's assignment of error is without merit.

ASSIGNMENT OF ERROR # 2
Texaco's second assignment of error is that the jury erred in its finding that the M/V "Bret B" was unseaworthy and that such unseaworthiness was a legal cause of Ellender's accident and injury.
Under admiralty and general maritime law a shipowner owes the duty to furnish a vessel reasonably safe and fit for its intended purpose. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed. 941 (1960). This duty to prevent unseaworthy conditions is absolute, continuing and nondelegable. Allen v. Seacoast Products, Inc., 623 F.2d 355 (5th Cir.1980). This duty includes the obligation to provide necessary appliances, gear and equipment. Webb v. Dresser Industries, 536 F.2d 603 (5th Cir.1976).
Texaco asserts that at the time of Ellender's accident the M/V "Bret B" was only being used to transport men and supplies to and from the worksite. Texaco concludes that since the M/V "Bret B" fulfilled this purpose the jury's conclusion that the M/V "Bret B" was unseaworthy is contrary to the evidence in the record.
We find that this assertion by Texaco construes the purpose of the M/V "Bret B" too narrowly. The M/V "Bret B's" intended purpose was not just to transport men and supplies to and from the worksite, but its purpose was to lay a flowline from a wellsite to a separator station. This purpose necessarily included the job of transporting men and supplies to and from the worksite.
The record shows that the M/V "Bret B" was well equipped to lay the flowline from the well to the shoreline. Even when the M/V "Bret B" reached a point where the water was too shallow for it to operate, the vessel was equipped with mechanical devices which enabled it to continue laying the flowline. But when it came down to laying the final 800-1000 feet of the flowline, no equipment was provided to aid the crew in this difficult task.
It is clear that an integral part of the M/V "Bret B's" functions included the laying of the line from the lake to the land. Texaco was aware of the work that would be required of the crew on the land. Texaco also knew of the conditions that the marsh would present. Despite this knowledge Texaco did not provide a marsh buggy, bulldozer or other equipment to aid their crew in this part of the operation.
As stated earlier, the failure to provide the proper equipment and gear for the completion of a vessel's intended purpose can form the basis for a finding of unseaworthiness. After hearing the testimony in this case the jury concluded that the failure to provide Ellender with proper equipment and gear rendered the M/V "Bret B" unseaworthy. We find that the testimony contained in the record forms an evidentiary basis for this conclusion. We reject Texaco's argument to the contrary.

ASSIGNMENT OF ERRORS # 3 & # 4
Texaco's third assignment of error is that the jury erred in its finding that Texaco was negligent and that the negligence was a legal cause of Ellender's accident and injuries. Texaco further asserts that the jury erred in its finding that Ellender was not negligent.
The Jones Act grants to any seaman a cause of action for personal injury caused by negligence of his employer. 46 U.S.C.A. Sec. 688. Ellender's status as a seaman within the meaning of the Jones Act is not *296 disputed, neither is the fact that Texaco is Ellender's Jones Act employer.
As Ellender's Jones Act employer, Texaco was under a duty to provide Ellender with a reasonably safe place to work. Rains v. Diamond M. Co., supra; Spinks v. Chevron Oil Company, 507 F.2d 216 (5th Cir. 1975). This broad duty is such that if Ellender can show his injuries were the result of even the slightest negligence of his employer, liability follows. Rains v. Diamond M. Co., supra; Davis v. Hill Engineering, Inc., 549 F.2d 314 (5th Cir.1977).
The record reveals that evidence was presented from which the jury could have reasonably inferred negligence by Texaco. First there is the testimony of Stanley Day, a safety expert. Day testified that from a safety standpoint, the load that Ellender and his co-worker was required to carry was too heavy for the conditions to which they were exposed. Dr. Akins testified that carrying a pipe in the manner required of Ellender was not recommended from an orthopedic standpoint. Dr. Akins further testified that performing this activity for several hours makes it progressively more dangerous. The testimony of Dr. Norman Morin, Texaco's medical expert, supported the testimony of Dr. Akins and Day. Dr. Morin testified that he would not recommend that anyone perform the type work Ellender was performing for several hours.
This testimony presents a reasonable evidentiary basis from which the jury could conclude that the procedure Ellender and his co-workers was following was unsafe. The jury could reasonably conclude that Texaco's failure to provide equipment or machinery necessary to perform the work safely constituted negligence. There is no dispute that machinery and equipment were available which would have made the job safe. We therefore conclude that there is sufficient evidence which supports the jury's finding of negligence on the part of Texaco.
Texaco also asserts that the jury erred in its finding that Ellender was not negligent.
Texaco attempts to shift the responsibility of providing a safe place to work from itself to Ellender. Texaco argues that Ellender, as head roustabout, had the authority to determine and request whatever supplies, equipment or manpower necessary to carry out the assigned job and that his failure to request any heavy equipment constituted negligence. This argument is made despite the fact that the record shows that the Texaco production foreman, through the district office in New Iberia, had the actual authority and responsibility to obtain the necessary equipment and supplies for a given job. The record also shows that in the past Ellender had requested heavy equipment for similar jobs but his requests were denied by his production foreman. We find no error in the jury's conclusion that Ellender was not negligent.

ASSIGNMENT OF ERROR # 5
Texaco's final assignment of error is that the jury erred in rendering an excessively high award in favor of Ellender.
Texaco contends that the medical testimony shows that there is absolutely nothing to prevent Ellender from returning to work as a head roustabout. Therefore, Ellender is not entitled to damages for loss of future income.
The record shows that Ellender has undergone three major back surgeries. He continues to take medication to relieve pain. Dr. Akins testified that Ellender can do no lifting, bending or stooping. Any long term standing or walking will cause him increased pain. Dr. Akins also feels that Ellender would be able to do certain jobs for only spurts of three to four days but then he would have to take off due to the increase in pain and discomfort.
Jury awards under Maritime Law and the Jones Act must stand unless the appellate court finds there is no law and no evidence to sustain them. Rains v. Diamond M. Co., supra; Trahan v. Gulf Crews, Inc., supra. We conclude that there is evidence from which the jury could reasonably conclude that Ellender is entitled to damages for loss of future wages.
*297 Expert testimony presented at trial calculated Ellender's future wage loss, including an inflation factor, at $615,035.06. Added to this figure was the wage loss from the date of the accident to the time of trial which gave Ellender a total loss of wages in the amount of $695,999.30.
Texaco asserts that it was error to include inflation as a factor in determining future wage loss. We ruled on this very issue in Rains v. Diamond M. Co., supra, where we stated:
"Defendant contends it was error to include inflation as a factor in determining future wage loss. The rule in the Fifth Circuit, established in Johnson v. Penrod Drilling Company, 510 F.2d 234 (5th Cir.1975), was that inflation and cost of living increases should not be used to determine future pecuniary losses due to the speculative nature of these factors. Recently, however, in Norfolk & W. Ry. Company v. Leipelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), these very factors were approved by the Supreme Court in the determination of future wage losses. This recent ruling of the Supreme Court is controlling."
We reject Texaco's argument that inflation was improperly included as a factor in determining future wage loss.
Ellender also suffered other losses in addition to loss of wages. The record shows that Ellender's activities have been severely limited. Prior to his accident Ellender held Little Britches Rodeos in the arena behind his house. Since the accident Ellender has been unable to continue this practice. Ellender has also been unable to continue showing livestock at livestock shows throughout the state. He has been forced to give up his garden since he cannot operate his tractor which was used to maintain the garden. Also, his social activities have been greatly curtailed.
The jury's award of $700,000.00 is only a few thousand dollars greater than Ellender's total loss of wages. After reviewing this and the other evidence presented, we cannot say that the jury award was excessive.

PRE-JUDGMENT INTEREST
After the jury rendered its verdict, Ellender filed a rule to show cause seeking an award of pre-judgment interest. The trial court refused to award pre-judgment interest relying on Rains v. Diamond M. Co., supra, and Morris v. Transworld Drilling Co., 365 So.2d 46 (La.App. 3rd Cir. 1978).
We affirm the lower court's decision to deny prejudgment interest although we do not feel that Rains and Morris are the exact statements of the law in the present situation.
In Morris, the trial court refused to grant pre-judgment interest on a claim based solely on the Jones Act and tried to a jury. In Rains, it appears that the jury rejected the plaintiff's maritime claim but found liability solely under the Jones Act. In both Morris and Rains this court properly held that pre-judgment interest is not allowed in a suit brought against ones employer under the Jones Act and tried before a jury. These decisions are in keeping with the federal jurisprudence which denies prejudgment interest in Jones Act claims brought on the law side of the court.
In the present case, the jury specifically found liability under the Jones Act and under general maritime law. Therefore, the issue is whether pre-judgment interest is precluded on the general maritime claim since it was tried to a jury with the Jones Act claim. Neither Ellender nor Texaco has cited authority which explicitly rejects, mandates, or allows an award of pre-judgment interest in a case of this posture. Neither Rains nor Morris address this issue. In fact, this Court in Rains stated, "Whether pre-judgment interest is allowed under General Maritime Law is not before us."
The U.S. Fifth Circuit Court of Appeal had an opportunity to address this issue in Doucet v. Wheless Drilling Company, 467 F.2d 336 (5th Cir.1972), but declined to do so. Doucet involved a claim under the Jones Act and maritime law. The plaintiff in Doucet initially began his action on the law side of the court. Three days prior to *298 trial the plaintiff waived his request for a jury trial. The trial court treated this waiver as an election to proceed in admiralty rather than in law and thereby awarded pre-judgment interest. Defendant-appellant argued that since the necessary pleading requirements were not followed the action remained on the law side of the court, therefore, interest was not available. Plaintiff argued that based on its maritime law discretion the court, on the law side, could grant pre-judgment interest against the defendant because the defendant was charged with and found liable for unseaworthiness.
The Fifth Circuit upheld the decision of the trial court that plaintiff had elected to proceed in admiralty and affirmed the award of pre-judgment interest. Therefore, it was unnecessary to address plaintiff's argument that pre-judgment interest could be awarded even on the law side of the court.
Since Doucet, the Fifth Circuit has allowed the award of pre-judgment interest in a maritime claim tried on the law side of the court. Havis v. Petroleum Helicopters, Inc., 664 F.2d 54 (5th Cir. 1981). In Havis, the Court concluded that where a maritime cause of action is tried solely to a jury, the grant or denial of pre-judgment interest must be submitted to the jury.
Although Havis is not dispositive of the issue of whether pre-judgment interest is precluded on a general maritime claim tried with a Jones Act claim before a jury, it does hold that the grant or denial of such interest in a general maritime claim tried to a jury is a decision to be made by the Jury.
In the present case, as was the case in Harvis, nothing was mentioned about prejudgment interest when the case was submitted to the jury as the trier of fact. No instructions were given to the jury by the court and no evidence was introduced on the subject. The interrogatories submitted to the jury in reaching its verdict did not contain a specific question of whether or not pre-judgment interest was to be awarded. Under the particular facts of this case we must affirm the decision of the trial judge, since the question of pre-judgment interest was not presented to the jury for its determination.
For the foregoing reasons the judgment of the lower court is affirmed. All costs are to be paid by defendants, Texaco, Inc. and American Motorists Insurance Company.
AFFIRMED.